# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| IEHAB HAWATMEH, et al., | Case No.: 2:22-cv-01786-APG-DJA |
| Plaintiffs | **Order (1) Granting in Part Defendants' Motion to Dismiss and (2) Granting in Part Plaintiffs' Motion to Amend** |
| v. | |
| CITY OF HENDERSON, et al., | [ECF Nos. 25, 45] |
| Defendants | |

Plaintiffs Iehab, Yasmeen, and Layth Hawatmeh, as well as Iehab as administrator of the estate of Joseph Hawatmeh, sue the City of Henderson, Henderson Police Department (HPD), and several HPD officers after 12-year-old Joseph was killed during a hostage situation. The Hawatmehs allege First, Fourth, Fifth, and Fourteenth Amendment violations under 42 U.S.C. § 1983 and bring state law claims for negligence, negligent and intentional infliction of emotional distress, wrongful death, and negligent supervision and training. The defendants move for dismissal on various grounds. The Hawatmehs oppose and move for leave to amend to add newly discovered facts and an excessive force claim under the Nevada Constitution, which the defendants oppose as futile.

I dismiss the federal claims with leave to amend if facts exist to do so. Because the Hawatmehs have not yet plausibly alleged a federal claim, I do not address their state law claims. The Hawatmehs may file an amended complaint curing the deficiencies identified herein by October 2, 2023. If they do not, I will dismiss the case without prejudice to their state law claims being brought in state court.

/ / / /

/ / / /

# I.  BACKGROUND

1

2       The facts of this case are indisputably tragic.[1]  On the morning of November 3, 2020,

3 Joseph's mother, Dianne, and his sister, Yasmeen, were returning to the family's apartment when

4 their upstairs neighbor, Jason Neo Bourne, confronted them in the parking lot.  Bourne walked

5 away briefly but then chased them into their apartment, where Joseph and two housekeepers

6 were already inside.  Bourne shot and killed Dianne and one of the housekeepers, Veronica

7 Gonzalez, and shot Yasmeen several times in the abdomen and leg.  The other housekeeper,

8 Lourdes Gonzalez, hid undetected in the bathroom.  Bourne demanded the keys to Dianne's

9 Cadillac Escalade from Joseph and Yasmeen, and when they could not find them, he shot

10 Yasmeen again.  Bourne eventually obtained the keys, took Yasmeen and Joseph's cell phones,

11 took Joseph hostage, and left the apartment.  Lourdes and a neighbor separately called 911 to

12 report the shootings after Bourne left, and Lourdes provided a description of Bourne.

13       Bourne placed Joseph in the passenger seat of the Escalade, got in the driver's seat, and

14 called 911 from Joseph's phone while the car remained parked in the apartment complex lot.

15 Bourne told the dispatcher that he had a gun, had taken Joseph hostage, and that he wanted a

16 helicopter within ten minutes.  Bourne appeared delusional throughout the call, stating that he

17 was in a movie, that he forgot to take his medication, that he had nano explosives inside of him,

18 and that he wanted Katy Perry and Arnold Schwarzenegger to be involved.  Bourne also

19 threatened to shoot Joseph and, according to the 911 transcript, seemed to point the gun at Joseph

20 multiple times.  During the call, Joseph's brother, Layth, who was with their father, Iehab, called

21 Yasmeen's phone, and Bourne told Joseph to answer it.  The call remained open for hours, and

22

23

---

[1] All facts are taken from the complaint (ECF No. 1).

1  Layth and Iehab could hear Bourne and Joseph speaking to each other, as well as the gunshots
2  that ultimately killed them.

3      HPD officers arrived within minutes of the first 911 call and located the Escalade with
4  Bourne and Joseph.  HPD Sergeant Smith was in charge of the scene and establishing a
5  perimeter.  She informed dispatch and other officers that she could see a 12-year-old child in the
6  passenger seat and that Bourne had a gun.  Smith also asked for stop sticks (tire deflation
7  devices) over the radio.  At one point Sergeant Smith yelled for Bourne to step out of the vehicle,
8  but Bourne did not react.  The windows were rolled up, and the 911 transcript does not reflect
9  any sound from Smith.  Smith asked dispatch to see if Bourne would roll down the window, but
10  that command was never relayed to Bourne.

11      Smith communicated with HPD Officers Duffy and Pendleton, who had Bourne in their
12  sights, about using lethal force if they saw Bourne's gun.  SWAT officers were en route but had
13  not yet arrived.  Bourne became more menacing to Joseph as the police neared the Escalade, and
14  Smith told Pendleton, "Take the shot if you have it." ECF No. 1 at 38.  Immediately after
15  Smith's command, and approximately 17 minutes into the 911 call, Pendleton fired a single shot
16  at Bourne.  Joseph screamed, and a second later, two additional gunshots sounded, followed by a
17  volley of contagious gunfire from officers on scene, during which Smith was repeatedly yelling
18  "stop" and "ceasefire." *Id.*

19      After the gunfire ended, officers approached the Escalade, which had its engine revving.
20  Officer Lujan put a rifle through the rear hatch,  Bourne yelled "yeah," and Lujan shot Bourne
21  through the driver's seat.[2]  Officers fired a total of 28 shots at the vehicle, and both Bourne and

22

23  [2] In their motion to amend, the plaintiffs explain that they previously believed Bourne survived
Officer Pendleton's initial shot because the transcript attributes a "yeah" to Bourne after the
initial volley of gunfire. ECF No. 45 at 3-4.  However, they now believe the "yeah" may have

1 Joseph were killed.  Joseph was shot twice in the head.  Just prior to the shots being fired, the

2 911 transcript reflects Bourne stating "I'm a shoot him in the brain" and Joseph screaming "just

3 please, don't shoot me." *Id.* at 30.  After the gunfire ended, Sergeant Smith stated over the radio

4 that Bourne "put gun up to kid and we shot him[, a]nd then everyone fired." *Id.* at 39.  The

5 complaint alleges upon information and belief that officers were the source of the bullets that

6 killed Joseph.[3]

7 **II. DISCUSSION**

8          In considering a motion to dismiss, I take all well-pleaded allegations of material fact as

9 true and construe the allegations in a light most favorable to the non-moving party. *Kwan v.*

10 *SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017).  However, I do not assume the truth of

11 legal conclusions merely because they are cast in the form of factual allegations. *Navajo Nation*

12 *v. Dep't of the Interior*, 876 F.3d 1144, 1163 (9th Cir. 2017).  Mere recitals of the elements of a

13 cause of action, supported by conclusory statements, do not suffice. *Ashcroft v. Iqbal*, 556 U.S.

14 662, 678 (2009).  A plaintiff must also make sufficient factual allegations to establish a plausible

15 entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  A claim is facially

16 plausible when the complaint alleges facts that allow the court to draw a reasonable inference

17 that the defendant is liable for the alleged misconduct. *Iqbal*, 556 U.S. at 678.  When the claims

18 have not crossed the line from conceivable to plausible, the complaint must be dismissed.

19 *Twombly*, 550 U.S. at 570.

20

21

22 been a nearby officer, and that Officer Pendleton killed Bourne with the first shot.  At this point,
I take the allegations as they were pleaded in the original complaint.

23 [3] The defendants dispute that officers shot Joseph but acknowledge that at this stage I take the
allegations in the complaint as true. ECF No. 25 at 4 n.1.

1 **A.  Section 1983 Claims**

2  To prevail on a claim under § 1983, a plaintiff must show "(1) that a right secured by the

3 Constitution or laws of the United States was violated, and (2) that the alleged violation was

4 committed by a person acting under the color of State law." *Long v. County of Los Angeles*, 442

5 F.3d 1178, 1185 (9th Cir. 2006).  The defendants do not dispute that they acted under color of

6 law, but they argue they did not violate the plaintiffs' constitutional rights and are shielded by

7 qualified immunity.

8  In evaluating whether qualified immunity applies, I "must determine whether: (1) the

9 facts adduced constitute the violation of a constitutional right; and (2) the constitutional right was

10 clearly established at the time of the alleged violation." *Daniels Sharpsmart, Inc. v. Smith*, 889

11 F.3d 608, 617 (9th Cir. 2018) (quotation omitted).  I may answer these two questions in any

12 order. *Alston v. Read*, 663 F.3d 1094, 1098 (9th Cir. 2011).  The Hawatmehs bear the burden of

13 showing the right at issue was clearly established. *Id.*  "To be clearly established, a right must be

14 sufficiently clear that every reasonable official would have understood that what he is doing

15 violates that right." *Stewart v. Aranas*, 32 F.4th 1192, 1195 (9th Cir. 2022) (quotation omitted).

16 The Hawatmehs do not necessarily have to point to a case directly on point, but existing caselaw

17 "must place the lawfulness of the particular action beyond debate." *Gordon v. County of Orange*,

18 6 F.4th 961, 969 (9th Cir. 2021) (simplified).  Furthermore, I must define the right "at the

19 appropriate level of specificity," not at a "high level of generality," before determining if it was

20 clearly established. *Id.* at 968-69 (simplified).

21  1.  Official Capacity Claims

22  The Hawatmehs sue HPD Chief Andres in his official capacity and all the officers on

23 scene in in their individual and official capacities.  The defendants move to dismiss these official

capacity claims as redundant of the claims against the City of Henderson.  Official-capacity suits against government officials "represent only another way of pleading an action against an entity of which an officer is an agent." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (quotation omitted). "When both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court may dismiss the officer as a redundant defendant." *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008). Because the City of Henderson is also named as a defendant, retaining the official capacity claims against the officers is duplicative.  I therefore dismiss Chief Andres, who was named only in his official capacity, and I dismiss the official capacity claims against all the remaining HPD officers.

### 2.  Excessive Force

The Hawatmehs' first cause of action alleges that the defendants subjected Joseph to excessive force.[4]  "Allegations of excessive force are examined under the Fourth Amendment's prohibition on unreasonable seizures." *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010). Plausibly stating an excessive force claim requires alleging both that (1) a seizure occurred and (2) the seizure was unreasonable. *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989).  The defendants argue that an accidentally shot hostage is not seized under the Fourth Amendment, and that even if Joseph was seized, the officers are entitled to qualified immunity. ECF No. 25 at 6-7.  The Hawatmehs respond that Joseph was seized both when officers surrounded the

---

[4] The complaint is not clear about which plaintiffs bring which claims against which defendants. But as the plaintiffs appear to concede in their response, Fourth Amendment rights are personal, and only Iehab as the appointed administrator of Joseph's estate may assert this claim. *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369-70 (9th Cir. 1998); Nevada Revised Statutes (NRS) § 41.100(3).  To the extent Yasmeen, Layth, or Iehab in his individual capacity assert a Fourth Amendment claim, they fail as a matter of law, and I dismiss those claims with prejudice.

1   Escalade and again when officers shot him, and that questions of fact regarding the

2   reasonableness of the officers' force preclude the grant of qualified immunity. ECF No. 39 at 8-

3   11.

4        "A person is seized under the Fourth Amendment when there is a governmental

5   termination of freedom of his movement through means intentionally applied." *Villanueva v.*

6   *California*, 986 F.3d 1158, 1166 (9th Cir. 2021) (simplified).  There are two categories of

7   seizures: those by force, and those by acquisition of control. *Torres v. Madrid*, 141 S. Ct. 989,

8   1001 (2021).  A seizure by force involves "the application of physical force to the body of a

9   person with intent to restrain." *Id.* at 1003 (holding officers seized a suspect when they

10  intentionally shot her even though she temporarily evaded capture).  By contrast, a seizure by

11  acquisition of control "involves either voluntary submission to a show of authority or the

12  termination of freedom of movement." *Id.* at 1001 (noting a driver crashing into a police

13  roadblock set up to stop him is a "prime example" of the latter).  A necessary condition for either

14  type of seizure is that the government conduct "objectively manifests an intent to restrain." *Id.* at

15  998 (emphasis omitted).

16       The Hawatmehs first argue that Joseph was seized when HPD officers surrounded the

17  Escalade, citing the many officers in the area and the mention of stop sticks to immobilize the

18  vehicle.  But that argument is predicated on the idea that officers seized the Escalade's occupants

19  by acquisition of control, and "actual control is a necessary element for this type of seizure." *Id.*

20  at 1001.  Bourne, not the officers, had actual control of Joseph in the Escalade.  The 911 call

21  transcript reflects Bourne telling Joseph what to say and do, pointing a gun at him, and

22  threatening to shoot him in the head. ECF No. 1 at 28-30.  A seizure by control requires "that a

23  person be stopped by the very instrumentality set in motion . . . to achieve that result." *Torres*,

141 S. Ct. at 1001 (quotation omitted).  The complaint does not allege that the stop sticks or any

other mechanism stopped the vehicle, nor is it clear how "surrounded" the Escalade was.[5]  And

for seizures by control, a "show of authority" without a corresponding termination of freedom of

movement is not a seizure. *California v. Hodari D.*, 499 U.S. 621, 628 (1991) (quotation

omitted).  Nor could Joseph have been seized through voluntary submission to a show of

authority.  A person is seized after an intentional show of authority when "in view of all of the

circumstances surrounding the incident, a reasonable person would have believed that he was not

free to leave." *Brendlin v. California*, 551 U.S. 249, 255 (2007) (quotation omitted).  Joseph

would have believed he was not free to leave because of Bourne, not because of the officers there

to rescue him.  Joseph was not seized when officers surrounded the vehicle.

The Hawatmehs next argue Joseph was seized when officers shot him.  They argue a

"seizure occurs even when an unintended person or thing is the object of the detention or

taking," so long as the taking is "willful." ECF No. 39 at 8 (citing *Brower v. County of Inyo*, 489

U.S. 593, 596 (1989)).  Because officers willfully fired on the Escalade, the Hawatmehs argue,

officers seized Joseph when they shot him even if they did not mean to shoot him specifically.

But because officers intended to seize Bourne, not Joseph or the vehicle, Joseph was not seized

under the Fourth Amendment.

A seizure by force requires "the use of force *with intent to restrain*.  Accidental force will

not qualify." *Torres*, 141 S. Ct. at 998 (emphasis in original).  "Nor will force intentionally

applied for some other purpose satisfy this rule." *Id.*  The question is therefore not whether

---

[5] The complaint does not indicate how many officers were present, where they were in relation to the Escalade, whether stop sticks were just requested or actually obtained, and if so, how proximate they were to the vehicle.  Indeed, the need for stop sticks implies that officers were not in control and had not yet terminated the Escalade's freedom of movement.

officers used intentional force, but rather whether they used force "with intent to restrain."[6]  An officer who intentionally fires at a suspect but hits an innocent bystander does not seize the bystander, because the bystander was not the intended object of the force.[7]  By contrast, an officer who intentionally fires at a victim they mistook for a suspect has seized the victim, because the victim was the intended object of the officer's force. *Jensen v. City of Oxnard*, 145 F.3d 1078, 1083 (9th Cir. 1998).  And an officer who intentionally shoots at a group of students and hits one has seized the student, even if the officer did not intend to seize that specific student, because the officer intended to apply force to the group. *Nelson v. City of Davis*, 685 F.3d 867, 877 (9th Cir. 2012).  Finally, officers who intentionally shoot at a truck slowly moving towards them seize the truck's passenger, even if they are unaware of the passenger's presence, because they intentionally fired at the truck to stop its movement. *Villanueva*, 986 F.3d at 1167-69.

These cases make clear that the force required for a Fourth Amendment seizure is not just force intentionally applied, but rather force intentionally applied to the target that officers sought to restrain.  Joseph was not seized when he was shot because unlike in *Villanueva*, where officers intended to restrain the truck (and incidentally anyone in it), or *Nelson*, where officers intended

---

[6] An officer's subjective intent is not typically considered in Fourth Amendment analyses. *See Brendlin*, 551 U.S. at 260.  But I must consider intent when determining whether a seizure has occurred because intentionality is "implicit in the word 'seizure,' which can hardly be applied to an unknowing act." *Brower*, 489 U.S. at 596.

[7] *See, e.g.*, *Brower*, 489 U.S. at 596-97 (distinguishing between government acts aimed at producing a particular result and those that simply cause a particular result); *United States v. Lockett*, 919 F.2d 585, 590 n.4 (9th Cir. 1990) (noting an innocent bystander struck by an officer's stray bullet aimed at a suspect would not have a Fourth Amendment claim); *Arruda ex rel. Arruda v. County of Los Angeles*, 373 F. App'x 798, 799 (9th Cir. 2010) (officer struck by another officers' stray bullet was not seized); *Rodriguez v. City of Fresno*, 819 F. Supp. 2d 937, 948 (E.D. Cal. 2011) (bystander shot in police crossfire aimed at suspect was not seized); *Rucker v. Harford County*, 946 F.2d 278, 280-81 (4th Cir. 1991) (same); *Claybrook v. Birchwell*, 199 F.3d 350, 354, 359 (6th Cir. 2000) (same); *Bublitz v. Cottey*, 327 F.3d 485, 489 (7th Cir. 2003) (bystanders injured by suspect's car after police deployed tire spikes were not seized).

to restrain the group (and incidentally anyone in it), officers shot at the Escalade exclusively to restrain Bourne.  The complaint indicates Bourne put a gun to Joseph's head and then officers fired.  While it states that officers on scene failed to deescalate the situation or communicate with other officers to prevent contagious gunfire, it does not allege facts indicating an intent to restrain anyone or anything other than Bourne. ECF No. 1 at 39, 41.

The Hawatmehs also argue that after Bourne was initially shot, Joseph became a passenger, not a hostage, and per *Villanueva*, a passenger shot when officers attempt to stop a vehicle is seized. 986 F.3d at 1169.  But as discussed, officers were trying to stop Bourne, not the vehicle, and *Villanueva* itself distinguishes "the very different situation where the passenger was also a hostage and the officers were trying to rescue the passenger, not arrest him." *Id.* at 1167. The great weight of authority indicates a hostage accidentally injured by police force aimed at their captor is not seized within the meaning of the Fourth Amendment. *See, e.g.*, *Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 795 (1st Cir. 1990); *Medeiros v. O'Connell*, 150 F.3d 164, 168 (2d Cir. 1998); *Childress v. City of Arapaho*, 210 F.3d 1154, 1156-57 (10th Cir. 2000).

Even viewing the allegations in the light most favorable to the plaintiffs, Joseph was neither seized when officers surrounded the Escalade nor when he was shot.  But even if he was seized, the officers would be entitled to qualified immunity.  The Hawatmehs do not identify, nor can I find, clearly established law that a hostage in either circumstance is seized under the Fourth Amendment.  To the extent the Hawatmehs contend that *Villanueva* clearly establishes that a hostage-passenger is seized when officers intentionally shoot at a vehicle such that every reasonable official would know their conduct was a Fourth Amendment seizure (a proposition with which I disagree), that proposition was not clearly established in November 2020.

1    I therefore dismiss the excessive force claim asserted by Iehab as the appointed

2    administrator of Joseph's estate with leave to amend.  It does not appear there are facts under

3    these circumstances that would plausibly allege a Fourth Amendment violation.  Nevertheless,

4    out of an abundance of caution, if Iehab as the appointed administrator of Joseph's estate can

5    allege sufficient facts to state a claim, then I give him the opportunity to do so. *Sonoma Cnty.*

6    *Ass'n of Retired Emps. v. Sonoma County*, 708 F.3d 1109, 1118 (9th Cir. 2013) ("As a general

7    rule, dismissal without leave to amend is improper unless it is clear ... that the complaint could

8    not be saved by any amendment." (simplified)).

9                        3.  Substantive Due Process

10    The Hawatmehs also bring substantive due process claims against the defendants for

11    (1) depriving Joseph of his right to life and (2) depriving his family members of their right to

12    familial companionship.[8]  Because officers were reacting to a rapidly evolving situation and did

13    not act with a purpose to harm Joseph, these claims fail.

14    The Due Process Clause of the Fourteenth Amendment "guarantees more than fair

15    process, and the 'liberty' it protects includes more than the absence of physical restraint."

16    *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997).  "[W]here a particular Amendment

17    provides an explicit textual source of constitutional protection against a particular sort of

18    government behavior, that Amendment, not the more generalized notion of substantive due

19    process, must be the guide for analyzing these claims." *County of Sacramento v. Lewis*, 523 U.S.

20

21    [8] As with the excessive force claim, the complaint is not clear about which family members

22    assert this claim.  But as the plaintiffs appear to concede in their response, only Iehab as Joseph's
      father may assert a Fourteenth Amendment deprivation of familial relationship claim. *Ward v.*

23    *City of San Jose*, 967 F.2d 280, 284 (9th Cir. 1991), *as amended on denial of reh'g* (June 16,
      1992).  To the extent Yasmeen or Layth assert a Fourteenth Amendment claim, their claims fail
      as a matter of law and I dismiss their claims with prejudice.

1  833, 842 (1998) (quotation omitted).  But where another Amendment does not explicitly protect

2  against abusive government action, such as when law enforcement officers unintentionally

3  caused a death during a high-speed chase and thus did not 'seize' the decedent under the Fourth

4  Amendment, or when a decedent's family brought a loss of familial association claim, that claim

5  is properly analyzed under the substantive due process framework. *Lewis*, 523 U.S. at 843-44;

6  *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056-57 (9th Cir. 2022).  Because Joseph was not seized

7  under the Fourth Amendment, and because no other amendment explicitly protects familial

8  relationships, both Joseph's and Iehab's claims are appropriately analyzed under the Fourteenth

9  Amendment.

10         To state a claim for a substantive due process violation, the Hawatmehs must allege that

11  the officers' actions "shocked the conscience." *Nicholson v. City of Los Angeles*, 935 F.3d 685,

12  692 (9th Cir. 2019) (quotation omitted).  This is a high bar referring to "only the most egregious

13  official conduct." *Lewis*, 523 U.S. at 846.  If officers had time to deliberate before acting, their

14  deliberate indifference may shock the conscience if the plaintiff can show officers "disregarded a

15  known or obvious consequence" of their actions. *Nicholson*, 935 F.3d at 692-93.  By contrast, if

16  the situation escalated so quickly that officers had to make a snap judgment, then their actions

17  will shock the conscience only if officers "acted with a purpose to harm for reasons unrelated to

18  legitimate law enforcement objectives." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).

19  "Deliberation" is not meant in a "narrow, technical sense," as when a shooter thinks in the

20  seconds before firing a shot. *Lewis*, 523 U.S. at 851 n.11.  "Actual deliberation" is not possible if

21  officers were forced to make their decision "in haste, under pressure, and [] without the luxury of

22  a second chance." *Id.* at 853.  Rather, actual deliberation refers to situations where officers can

23

make "unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Id.*

The Hawatmehs argue that the deliberate indifference test applies because officers had time to take reasoned action, pointing out that Bourne was on the 911 call for 17 minutes before shots were fired. They also argue that Bourne became more aggressive toward Joseph only after officers neared the Escalade. But the complaint alleges that officers arrived on scene knowing Bourne had shot multiple people, had a hostage, and was making threats to kill him. ECF No. 1 at 34. The complaint alleges that Sergeant Smith stated she saw the gun, saw Joseph in the passenger seat, and saw Bourne put the gun to Joseph's head. *Id.* at 36, 39. Although the transcript is not time-stamped, it indicates Bourne had the gun trained on Joseph at least part of the time because Joseph asked Bourne not to point the gun at him, later asked Bourne to put the gun elsewhere, and Bourne subsequently asked "you want me to take the gun off of you?" *Id.* at 25-26, 29. And as the Hawatmehs themselves point out, less than eight minutes elapsed between when officers first identified the Escalade and when they fired the first shot. ECF No. 39 at 16.

Because actual deliberation was not possible in these circumstances, the purpose to harm test applies. The Hawatmehs do not plausibly allege that officers acted with a purpose to harm Joseph. Rather, the complaint alleges that officers fired to kill Bourne. ECF No. 1 at 41. And even assuming the deliberate indifference standard applied, officers would be entitled to qualified immunity because the Hawatmehs do not identify any case law clearly establishing that officers who accidentally shoot a hostage have violated the Fourteenth Amendment. I therefore

1  dismiss Iehab's and Joseph's substantive due process claims with leave to amend if facts exist to

2  do so.[9]

3              4.  *Monell* Liability

4        The Hawatmehs assert several claims under § 1983 against the City of Henderson and

5  HPD.[10]  To prevail on a § 1983 claim against a municipality, a plaintiff must prove: "(1) they

6  were deprived of their constitutional rights by defendants and their employees acting under color

7  of state law; (2) that the defendants have customs or policies which amount to deliberate

8  indifference to their constitutional rights; and (3) that these policies are the moving force behind

9  the constitutional violations." *Lee v. City of Los Angeles*, 250 F.3d 668, 681-82 (9th Cir. 2001)

10  (simplified).  Conclusory allegations that a municipality has a policy or practice of violating

11  constitutional rights do not provide the defendant with fair notice of what the claim is and the

12  grounds upon which it rests. *Twombly*, 550 U.S. at 555.

13        Because the Hawatmehs have not yet plausibly alleged a federal constitutional violation,

14  they have not yet alleged a *Monell* violation. I there dismiss these claims with leave to amend.

15  Should the Hawatmehs choose to amend their claims, they are encouraged to identify the specific

16  policies or customs they challenge and the underlying facts that support their claims.

17

18

19

20  [9] In the same cause of action alleging the violation of the plaintiffs' familial rights, the complaint
    states that the defendants violated the plaintiffs' First and Fifth Amendment rights. ECF No. 1 at
21  46.  The Hawatmehs do not argue how those Amendments were violated nor do I see a cause of
    action based on these facts, so I dismiss this claim.

22  [10] The defendants argue that because HPD is not a cognizable legal entity, it lacks the capacity to
23  be sued under Nevada law and must be dismissed from the *Monell* claims. ECF No. 25 at 13.
    The Hawatmehs do not respond to that argument, and therefore concede to HPD's dismissal. *See*
    LR 7-2(d).  I dismiss HPD from the *Monell* claims.

**B.  State Law Claims**

The Hawatmehs brings state law claims alleging negligence, negligent and intentional infliction of emotional distress, wrongful death, and negligent supervision and training.  I have supplemental jurisdiction over these claims under 28 U.S.C. § 1367(a).  I may decline to exercise supplemental jurisdiction if:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  If I determine that one or more of these conditions exists, I must then consider whether exercising jurisdiction would ultimately serve "the principles of economy, convenience, fairness, and comity . . . ." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988).  If these considerations do not favor exercising supplemental jurisdiction, then "[I] should hesitate to exercise jurisdiction over [the] state claims . . . ." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).  Whether to decline the exercise of supplemental jurisdiction under § 1367(c) lies within my discretion. *Satey v. JPMorgan Chase & Co.*, 521 F.3d 1087, 1091 (9th Cir. 2008).

I am not inclined to exercise supplemental jurisdiction over the Hawatmehs' state law claims.  First, I have dismissed the federal § 1983 claims over which I had original jurisdiction.  But beyond that, the Hawatmehs' state law claims raise unresolved issues of state law that are best determined by the Nevada courts, such that comity considerations weigh against exercising jurisdiction over them.  For example, the liability of police officers in hostage crises raises important issues of Nevada public policy.  Furthermore, the Hawatmehs seek leave to amend to

1  include an excessive force claim under the Nevada Constitution following *Mack v. Williams*, 522

2  P.3d 434, 442 (Nev. 2022) (en banc).  This is a newly-recognized claim and an evolving area of

3  Nevada law that Nevada courts are best situated to address.  I therefore decline to address the

4  state law claims until the plaintiffs have adequately alleged a federal claim.

5  **C.  Amendment**

6  The Hawatmehs request leave to amend to include newly discovered facts and to add

7  their Nevada constitutional claim.  The defendants oppose the motion as futile, because they

8  argue Nevada excessive force jurisprudence follows federal Fourth Amendment jurisprudence

9  and the Hawatmehs have failed to state a federal excessive force claim.  But because I have

10  granted leave to amend the excessive force claim if facts exist to do so, it is possible the

11  Hawatmehs may be able to state a claim under both the Nevada and U.S. Constitutions.  I

12  therefore grant the motion for leave to amend, although the proposed amended complaint

13  attached to the motion is deficient for the reasons stated in this order.  Should the Hawatmehs

14  choose to file an amended complaint, they are advised to make clear which claims are brought on

15  behalf of which plaintiffs against which defendants, and to address the other deficiencies

16  identified above.[11]

17  **III.  CONCLUSION**

18  I THEREFORE ORDER that the defendants' motion to dismiss (**ECF No. 25**) is

19  **GRANTED in part as to the plaintiffs' claims under 42 U.S.C. § 1983**.

20

21

---

22  [11] The Hawatmehs request that I treat their response as a motion for summary judgment if they are "unable to sustain their burden of proof on the pleadings." ECF No. 39 at 7.  They do not

23  submit any exhibits, state the basis for the motion, or identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  I therefore treat their response solely as a response.

I FURTHER ORDER that the plaintiffs' motion to amend (**ECF No. 45**) is **GRANTED in part**.  I grant the plaintiffs leave to amend, but the proposed amended complaint they attach to their motion is deficient.  If the Hawatmehs choose to file an amended complaint curing the deficiencies outlined in this order, they will file the first amended complaint by October 2, 2023.  If the plaintiffs do not file an amended complaint by that date, I will decline to exercise supplemental jurisdiction over the remaining state law claims and will dismiss them without prejudice to the plaintiffs pursuing them in state court.

DATED this 6th day of September, 2023.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE