UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| IEHAB HAWATMEH, et al., | Case No.: 2:22-cv-01786-APG-DJA |
|---|---|
| Plaintiffs | **Order Granting in Part Defendants' Motion to Dismiss** |
| v. | |
| CITY OF HENDERSON, et al., | [ECF No. 60] |
| Defendants | |

Plaintiffs Iehab, Yasmeen, and Layth Hawatmeh, as well as Iehab as administrator of the estate of Joseph Hawatmeh, sue the City of Henderson, the Henderson Police Department (HPD), and several HPD officers after 12-year-old Joseph Hawatmeh was killed during a hostage situation. I previously dismissed their federal claims alleging First, Fourth, Fifth, and Fourteenth Amendment violations under 42 U.S.C. § 1983. Finding no federal claims to establish federal jurisdiction, I did not address the Hawtmehs' state law claims. The Hawatmehs amended their complaint, including a new claim for excessive force in violation of the Nevada Constitution, and the defendants now move to dismiss the amended complaint. Because the Hawatmehs have still not plausibly alleged a federal cause of action, I dismiss their federal claims and I decline to exercise supplemental jurisdiction over the state law claims. Thus, I dismiss the state law claims without prejudice to the plaintiffs bringing them in state court.

**I. BACKGROUND**

I previously described these tragic events in detail and incorporate that previous description into this order. ECF No. 54 at 2-4. In summary, Joseph, his mother Dianne, his sister Yasmeen, and two housekeepers were confronted in their apartment by their neighbor, Jason Neo

Bourne.[1]  Bourne shot and killed Dianne and one of the housekeepers, Veronica Gonzalez, and severely wounded Yasmeen.  He then took the keys to Dianne's Cadillac Escalade and brought Joseph to the vehicle at gunpoint.  Bourne held Joseph hostage in the parked Escalade outside the apartment while Bourne called 911 from Joseph's cell phone.  The surviving housekeeper and a neighbor also called 911.

HPD officers arrived within minutes of the first 911 call and located the Escalade with Bourne and Joseph.  HPD Sergeant Smith was in charge of the scene and establishing a perimeter.  She informed dispatch and other officers that she could see a 12-year-old child in the passenger seat and that Bourne had a gun.  Smith also asked for stop sticks (tire deflation devices) over the radio.  At one point Smith yelled for Bourne to step out of the vehicle, but Bourne did not react.  The windows were rolled up, and the transcript of the 911 call placed from inside the vehicle does not reflect any sound from Smith.  Smith asked dispatch to see if Bourne would roll down the window, but that command was never relayed to Bourne.

The Hawatmehs' first amended complaint (FAC) alleges further details about how the HPD officers first surrounded the vehicle.  When they arrived on scene and identified the Cadillac Escalade, the vehicle was parked in a parking space facing a block wall.  At least sixteen HPD officers completely surrounded the sides and rear of the vehicle.  Police vehicles blocked the parking lot road approximately five to ten yards behind the Escalade, as well as the entrance to the apartment complex preventing all access in or out.  Bourne did not move the Escalade from this parking spot at any time and did not attempt to flee.  HPD Seargeant Smith shouted at the Escalade, "Let me see your hands, both of you.  Put your hands up, exit the

---

[1] All facts are taken from the first amended complaint (ECF No. 59).

vehicle." ECF No. 59 at 37. Smith subsequently announced over the radio that she saw a gun and "the child has his hands up." *Id.* at 38.

Smith communicated with HPD Officers Duffy and Pendleton to "take the shot if you have it." *Id.* at 39. Immediately after Smith's command, Pendleton fired a single shot at Bourne. Joseph screamed, and a second later, two additional gunshots sounded, followed by a volley of gunfire from the officers, during which Smith was repeatedly yelling "stop" and "ceasefire." *Id.* at 31, 39. Officers fired a total of 28 shots, and both Bourne and Joseph were killed. Joseph was shot twice in the head, once in the chest, and once in the leg. Just prior to the first shot being fired, the 911 transcript reflects Bourne stating "I'm a shoot him in the brain" and Joseph screaming "[j]ust please, don't shoot me." *Id.* at 31.

The FAC also elaborates on HPD's subsequent investigation and internal training procedures based on the deposition of former HPD Investigator Raymond Wilkins, a member of HPD's Critical Incident Review Unit (CIRU). Wilkins testified that HPD had known training deficiencies for dealing with barricaded suspects, vehicle assaults, and hostage rescue. He further described a practice at HPD of concealing or destroying information used by CIRU and the chief of police, as well as officers failing to read department policies and merely scrolling to the bottom of computer-based training and signing without reading. HPD and City leadership knows about this practice because the computer keeps track of when officers open and sign the documents. Wilkins was highly critical of Smith's decision-making and leadership during this incident and claims that HPD was aware of Smith's deficiencies. And Wilkins testified that the scene was not "fast moving" because the vehicle and Bourne were contained and there was time to wait for the SWAT members and hostage negotiators to arrive. *Id.* at 49-50.

////

## II. DISCUSSION

In considering a motion to dismiss, I take all well-pleaded allegations of material fact as true and construe the allegations in a light most favorable to the non-moving party. *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017).  However, I do not assume the truth of legal conclusions merely because they are cast in the form of factual allegations. *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1163 (9th Cir. 2017).  Mere recitals of the elements of a cause of action, supported by conclusory statements, do not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A plaintiff must also make sufficient factual allegations to establish a plausible entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  A claim is facially plausible when the complaint alleges facts that allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Iqbal*, 556 U.S. at 678.  When the claims have not crossed the line from conceivable to plausible, the complaint must be dismissed. *Twombly*, 550 U.S. at 570.

### A. Section 1983 Claims

I previously dismissed the Hawatmehs' § 1983 claims alleging Fourth Amendment seizure using excessive force and Fourteenth Amendment substantive due process violations against the individual officers, and *Monell* liability against the City of Henderson, allowing leave to amend their complaint. ECF No. 54.  The Hawatmehs have done so and renew each of their § 1983 claims.  I previously set forth the law on the elements of a claim under 42 U.S.C. § 1983, qualified immunity, and probable cause. *See id.* at 5.  I incorporate that law in this order.

#### 1. Excessive Force

I previously dismissed the Hawatmehs' excessive force claims and the *Monell* claims based on the alleged excessive force because the complaint failed to plausibly allege that Joseph

was seized under the Fourth Amendment, and even if he was seized, the individual officers were entitled to qualified immunity. *Id.* at 10. After amendment, the Hawatmehs[2] argue that they have plausibly alleged that Joseph was seized when: (1) the police surrounded the Escalade and blocked the exits with their vehicles, (2) Smith told Joseph to put his hands in the air and Joseph did so, and (3) the police fired at the Escalade. The defendants argue that Joseph's status as a hostage meant that the police could not seize him through these actions because police actions aimed at liberating a hostage are directed solely at the hostage taker even if they incidentally harm the hostage. They also argue that even if Joseph was seized, the law was not clearly established, so the officers are entitled to qualified immunity.

This case implicates various threads of Fourth Amendment case law because it involves the determination of when a hostage in a stationary vehicle is seized by police trying to rescue him. A person is seized under the Fourth Amendment when an officer either applies physical force or acquires control over that person. *California v. Hodari D.*, 499 U.S. 621, 626 (1991). A seizure by physical force requires "the use of force *with intent to restrain*. Accidental force will not qualify." *Torres v. Madrid*, 592 U.S. 306, 317 (2021) (emphasis in original). "Nor will force intentionally applied for some other purpose satisfy this rule." *Id.*

"Unlike a seizure by force, a seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement." *Id.* at 322. For seizure by voluntary submission to a show of authority, "there is no seizure without actual submission." *Cuevas v. City of Tulare*, 107 F.4th 894 (9th Cir. 2024) (quotation omitted). Seizure by restriction of movement requires that "a person be stopped by the very instrumentality

---

[2] Only Iehab as the appointed administrator of Joseph's estate brings the Fourth Amendment excessive force claims on Joseph's behalf.

5

set in motion or put in place in order to achieve that result," such as crashing into a police roadblock, ramming a car off road, or locking a person in a room. *Torres*, 592 U.S. at 322 (quotation omitted).

When police make a traffic stop of a vehicle, passengers are seized along with the driver. *Brendlin v. California*, 551 U.S. 249, 257, 260 (2007). All passengers are seized even if they are not the target of the stop because a "passenger will expect to be subject to some scrutiny, and his attempt to leave the scene would be so obviously likely to prompt an objection from the officer that no passenger would feel free to leave in the first place." *Id.* at 257. The seizure turns not on the officers' subjective intent in seizing the passenger, but the objective "intent that has been conveyed to the person confronted." *Id.* at 260-61 (simplified). A passenger is seized along with the driver even when the driver is seized by force. *Cuevas*, 107 F.4th at 899 (holding that, in the context of a vehicle stop where the driver was attempting to flee by driving away, the passenger was seized when the officer used physical force on the driver by instructing a K-9 to bite the driver); *see also Villanueva v. California*, 986 F.3d 1158, 1167 (9th Cir. 2021) (holding that a passenger was seized when the police accidentally shot the passenger while shooting to stop the car he was in).

A hostage, however, is under the control of the hostage taker. When police seize a hostage taker by restricting his freedom of movement, such as by surrounding a house, the hostages are not seized because there is "no reason for [the hostages] to believe that the police were preventing them from leaving the house. In fact, it was the clear objective of the police to remove them from the house and remove them from the control of [the hostage taker]. Their movement was restrained by [the hostage taker], not by the police." *Ewolski v. City of Brunswick*, 287 F.3d 492, 507 (6th Cir. 2002). Even a person who may briefly be seized through

submission to police authority is no longer seized when they are subsequently taken hostage. *See Schaefer v. Goch*, 153 F.3d 793, 794-97 (7th Cir. 1998) (holding that even if a bystander was seized when she complied with a police order to get down, that seizure ended when the suspect started to drag her inside a home while brandishing a gun).

The First, Second, and Tenth Circuits have each held that police do not seize a hostage when they shoot at a vehicle to stop the hostage taker. *Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 798 (1st Cir. 1990); *Medeiros v. O'Connell*, 150 F.3d 164, 168 (2d Cir. 1998); *Childress v. City of Arapaho*, 210 F.3d 1154, 1157 (10th Cir. 2000). Each of these cases relied on *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1998) to focus on the subjective intent of the officers in seizing the suspect, and not the hostage. *See e.g.*, *Childress*, 210 F.3d at 1156-57. They predate *Brendlin*'s holding that a traffic stop seizes the driver and all passengers because of the objective intent police communicate to the passengers. 551 U.S. at 260-61. Whether *Brendlin* changes the earlier vehicular hostage cases remains unsettled, but no court has concluded that a hostage would be seized under these circumstances.[3]

In *Villanueva*, which post-dates *Brendlin*, the Ninth Circuit held that a passenger was seized when the officers shot that passenger accidentally while shooting to stop the car. 986 F.3d at 1167. But the Ninth Circuit distinguished such a case from "the very different situation where

---

[3] *See Fagre v. Parks*, 985 F.3d 16, 22 n.2 (1st Cir. 2021) (declining to address whether *Brendlin* may require the First Circuit to reconsider its hostage decision in *Landol-Rivera* because the case could be resolved on other grounds); *Cooper v. Rutherford*, 503 Fed. Appx. 672, 675-76 (11th Cir. 2012) (remarking that there is a difference when an innocent bystander or hostage is accidentally shot as opposed to a passenger while holding that the law was not clearly established for qualified immunity purposes); *Rodriguez v. Passinault*, 637 F.3d 675, 686-87 (6th Cir. 2011) (holding that stopping a car by shooting the driver is a seizure of all passengers, but distinguishing the hostage situation because "there is no intentional acquisition of physical control of the hostage; rather the intention of the officer is manifestly not to seize, but rather to liberate the hostage").

7

the passenger was also a hostage and the officers were trying to rescue the passenger, not arrest him." *Id.* At least one other district court has declined to extend *Brendlin* to police accidentally shooting a hostage inside a moving vehicle. *Browell v. Davidson*, 595 F. Supp. 2d 907, 916 (N.D. Ind. 2009) (finding that because a hostage's "freedom was terminated by the hostage-taker and is in the car involuntarily," they are not seized when the police fire on the car).

The Hawatmehs argue that Joseph was seized when the officers surrounded the vehicle. In response to my previous order dismissing their claims, the FAC includes additional facts describing the measures HPD officers took to box in the Escalade and its occupants. ECF No. 59 at 15-16. Similar to officers surrounding a home in the hostage standoff in *Ewolski*, the HPD officers likely seized Bourne when they surrounded the Escalade, restricting Bourne's freedom of movement. But Joseph, as a hostage, remained detained at gunpoint by Bourne, not by the officers. A person is seized after an intentional show of authority when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Brendlin*, 551 U.S. at 255 (quotation omitted). But a reasonable hostage would welcome the arrival of police to liberate him, and the HPD officers even encouraged Joseph to exit the vehicle. ECF No. 59 at 37. Even accepting the FAC's allegations as true, Joseph would have believed he was not free to leave because of Bourne, not because of the officers there to rescue him. Joseph was not seized when the officers surrounded the vehicle.

Next the Hawatmehs argue that Joseph was seized when he raised his arms in response to Smith's command. Joseph raised his hands after Smith shouted, "[l]et me see your hands, both of you. Put your hands up, exit the vehicle." *Id.* An innocent bystander may become seized when they submit to police orders. *See Corbitt v. Vickers*, 929 F.3d 1304, 1313-14 (11th Cir. 2019) (holding that a bystander child was seized when he obeyed a police order to get on the

8

ground and was then accidentally shot by an officer serving an arrest warrant). Joseph, however, was not a bystander, he was a hostage. He could not fully submit to the police orders to exit the vehicle because he remained held at gunpoint by Bourne. Bourne, not the HPD, retained control of Joseph, so Joseph was not seized when he raised his hands, or, if he was, that seizure lasted only a moment because he thereafter did not follow Smith's direction to exit the car due to Bourne holding him at gunpoint. *See Schaefer*, 153 F.3d at 796-97 ("It is difficult to see how, even assuming that a seizure took place when Kathy complied with the officers' commands, that seizure could be seen as continuing once John began to pull Kathy back inside.").

Finally, the Hawatmehs renew their argument that Joseph was seized when he was accidentally shot by the officers. But a seizure by force requires the intent to restrain. *Torres*, 592 U.S. at 317. Thus, an officer who intentionally fires at a suspect but hits an innocent bystander does not seize the bystander, because the bystander was not the intended object of the force.[4] By contrast, an officer who intentionally fired at a hostage she mistook for a suspect seized the hostage, because the hostage was the intended object of the officer's force. *Huff v. Reeves*, 996 F.3d 1082, 1088-89 (10th Cir. 2021). Here the HPD officers intended to shoot only Bourne, who they had properly identified as sitting in the driver seat. That Bourne and Joseph were inside a vehicle does not change this analysis. Both *Villanueva* and *Cuevas* involved the

---

[4] *See, e.g., Brower*, 489 U.S. at 596-97 (distinguishing between government acts aimed at producing a particular result and those that simply cause a particular result); *United States v. Lockett*, 919 F.2d 585, 590 n.4 (9th Cir. 1990) (noting an innocent bystander struck by an officer's stray bullet aimed at a suspect would not have a Fourth Amendment claim); *Arruda ex rel. Arruda v. Cnty. of Los Angeles*, 373 F. App'x 798, 799-800 (9th Cir. 2010) (officer struck by another officers' stray bullet was not seized); *Rodriguez v. City of Fresno*, 819 F. Supp. 2d 937, 948 (E.D. Cal. 2011) (bystander shot in police crossfire aimed at suspect was not seized); *Rucker v. Harford Cnty.*, 946 F.2d 278, 280-81 (4th Cir. 1991) (same); *Claybrook v. Birchwell*, 199 F.3d 350, 354, 359 (6th Cir. 2000) (same); *Bublitz v. Cottey*, 327 F.3d 485, 489 (7th Cir. 2003) (bystanders injured by suspect's car after police deployed tire spikes were not seized).

9

police stopping a car that was fleeing or attempting to flee and thus seizing all passengers.[5] But this incident was more analogous to the police surrounding a building or confronting a hostage taker in the open because the FAC alleges Bourne never moved the car or attempted to flee.

I previously rejected the Hawatmehs' theory that Joseph went from being a hostage to a passenger in the two seconds between Pendleton's initial shot and the volley of shots from the other officers. ECF No. 54 at 10. And no new allegations would support a reasonable inference that the firing officers were aware that Bourne was no longer a threat to Joseph. I agree with the great weight of authority holding that a hostage accidentally injured by police force aimed at his captor is not seized within the meaning of the Fourth Amendment.[6] Joseph was not seized when the officers fired on Bourne.

Even viewing the allegations in the light most favorable to the plaintiffs, Joseph was not seized when officers surrounded the Escalade, when Smith instructed him to raise his hands, or when he was shot. But even if he was seized, the officers would be entitled to qualified immunity. I previously held that the officers in this case should receive qualified immunity, and the Hawatmehs have not identified a case that would have placed the officers on notice that their conduct would violate the Fourth Amendment under these circumstances. The Hawatmehs rely only on cases stating the broad principle that "police officers cannot shoot a person if he does not pose an immediate risk of harm to an officer or third party." ECF No. 64 at 19. To reach this conclusion, they assert that Pendleton's initial shot killed Bourne so he ceased being any threat to Joseph, making the subsequent shots two seconds later unjustified. *Id.* But this is too broad a statement to clearly establish the law in this case. The FAC does not allege any facts to plausibly

---

[5] *Villanueva*, 986 F.3d at 1167; *Cuevas*, 107 F.4th at 899.

[6] *Landol-Rivera*, 906 F.2d at 795; *Medeiros*, 150 F.3d at 168; *Childress*, 210 F.3d at 1156-57; *Schaefer*, 153 F.3d at 796-97.

suggest that any of the officers firing in the second volley knew that Bourne had been killed and ceased to be a threat. The unsettled nature of the law on seizures in hostage-taking cases discussed above demonstrates that the law is not so clearly established that every reasonable official in these officers' shoes would know their conduct violated the Fourth Amendment. I therefore dismiss the § 1983 excessive force claims. While the facts of this case are undeniably tragic, the Fourth Amendment is not the proper tool to address them.

### 2. Substantive Due Process

I previously dismissed the Hawatmehs' Fourteenth Amendment substantive due process claims because the claims failed to satisfy the intent-to-harm standard and because the officers were entitled to qualified immunity. The Hawatmehs renew their substantive due process claims[7] by arguing that Wilkins' assessment that the scene was not "fast-moving" demonstrates that there was time for deliberation prior to the shooting. The defendants maintain that the scene required split-second decision-making and even if there were a due process violation, the officers are entitled to qualified immunity. Because the FAC does not change the fact that officers were reacting to a rapidly evolving situation and did not act with a purpose to harm Joseph, the FAC fails to plausibly allege a Fourteenth Amendment violation.

To state a claim for a substantive due process violation, the Hawatmehs must allege that the officers' actions "shock[ed] the conscience." *Nicholson v. City of Los Angeles*, 935 F.3d 685, 692 (9th Cir. 2019) (quotation omitted). This is a high bar, referring to "only the most egregious official conduct." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). If officers had time

---

[7] Specifically, Iehab, as the appointed administrator of Joseph's estate, asserts a claim against the defendants for depriving Joseph of his right to life under the Fifth and Fourteenth Amendments. ECF No. 59 at 54-55. And Iehab, as Joseph's father, asserts a claim against the defendants for depriving him of his right to familial companionship. *Id.* at 59-60.

to deliberate before acting, their deliberate indifference may shock the conscience if the plaintiff can show officers "disregarded a known or obvious consequence" of their actions. *Nicholson*, 935 F.3d at 692-93 (quotation omitted). By contrast, if the situation escalated so quickly that officers had to make a snap judgment, then their actions will shock the conscience only if officers "acted with a purpose to harm for reasons unrelated to legitimate law enforcement objectives." *Porter v. Osborn*, 546 F.3d 1131, 1142 (9th Cir. 2008). "Deliberation" is not meant in a "narrow, technical sense," as when a shooter thinks in the seconds before firing a shot. *Lewis*, 523 U.S. at 851 n.11. "Actual deliberation" is not possible if officers were forced to make their decision "in haste, under pressure, and [] without the luxury of a second chance." *Id.* at 853 (quotation omitted). Rather, actual deliberation refers to situations where officers can make "unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Id.*

The Hawatmehs argue that the deliberate indifference test applies because Wilkins opined that the scene was not "fast-moving," the officers were trained to wait for SWAT, and the officers accelerated the threat to Joseph by closing in around Bourne. But Wilkins' opinion does not change the objective facts in the FAC. The officers knew that Bourne had a gun and had already shot multiple people. ECF No. 59 at 36. They knew Bourne held Joseph hostage in a vehicle and was making threats to shoot him while not responding to officer commands. *Id.* at 36-38. Smith saw a gun and Joseph with his hands up. *Id.* at 37. From the moment the officers identified the Escalade with Bourne and Joseph to the time the shots were fired, fewer than six minutes had elapsed. *Id.* at 36-39. And during that time, officers had overlapping radio communications and on-scene commands as they maneuvered to contain Bourne and rescue

Joseph. *Id.* This was a scene demanding decisions made in haste, under pressure, and without the luxury of a second chance. Consequently, the deliberate indifference test is inapplicable.

Because the deliberate indifference test does not apply, the Hawatmehs must satisfy the intent-to-harm test to plead a plausible claim. The FAC adds no new facts, and the Hawatmehs make no argument, to show that the police acted with an intent to harm Joseph unrelated to legitimate law enforcement objectives. The Hawatmehs also did not respond to my previous ruling that even under the deliberate indifference test, the officers would be entitled to qualified immunity. The Hawatmehs do not point to, and I have not found, a case holding that officers who unintentionally shoot a hostage in similar circumstances violate the Fourteenth Amendment. As a result, the Hawatmehs have not plausibly alleged that the officers shot with an intent to harm Joseph. But even if the officers could be found to have acted with deliberate indifference, they are entitled to qualified immunity. I therefore dismiss the Hawatmehs' Due Process Claims.

### 3. *Monell* Liability

I previously dismissed the Hawatmehs' *Monell* claims because they failed to plausibly allege a federal constitutional violation. ECF No. 54 at 14. Because the FAC still does not allege such a violation, I again dismiss the Hawatmehs' *Monell* claims.

### B. State Law Claims

I previously advised the parties that if the Hawatmehs failed to plausibly allege a federal claim, I was not inclined to exercise supplemental jurisdiction over their state law claims. ECF No. 54 at 15-16. Because I once again dismiss all of the Hawatmehs' federal claims, I decline to exercise supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(c). I incorporate my prior analysis and find that the state law claims raise unresolved issues of state law that are best determined by Nevada courts. Declining jurisdiction would serve "the

principles of economy, convenience, fairness, and comity . . . ." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988); *see also* ECF No. 54 at 16-17.

### III.  CONCLUSION

I THEREFORE ORDER that the defendants' motion to dismiss (**ECF No. 60**) is **GRANTED in part.**  I grant summary judgment in the defendants' favor on the plaintiffs' claims under 42 U.S.C. § 1983.  I dismiss the plaintiffs' state law claims without prejudice to the plaintiffs pursuing those claims in state court.

I FURTHER ORDER the clerk of court to enter judgment in favor of the defendants and against the plaintiffs on the plaintiffs' federal claims under 42 U.S.C. § 1983, but the plaintiffs' state law claims are dismissed without prejudice to the plaintiffs pursuing those claims in state court.

DATED this 18th day of September, 2024.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE